UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

SHAWN MARIE KIRCHNER,

                    Plaintiff,                Civil Action No.: 12-cv-15052
                                        Honorable Patrick J. Duggan
       v.                       Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 13]

Plaintiff Shawn Kirchner brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions that have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.     RECOMMENDATION

For the reasons set forth below, the court finds that the Administrative Law Judge ("ALJ") properly assessed the evidence in this case and formed an appropriate hypothetical question. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Kirchner's motion [9] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On November 13, 2009, Kirchner filed an application for DIB, alleging disability as of April 15, 2000.  (Tr. 104-110).  The claim was denied initially on February 25, 2010.  (Tr. 52-56).  Thereafter, Kirchner filed a timely request for an administrative hearing, which was held on March 15, 2011, before ALJ Andrew Sloss.  (Tr. 27-39).  Kirchner, represented by attorney Mikel Lupisella, testified, as did vocational expert ("VE") Pauline McEachin.  (*Id.*).  On April 28, 2011, the ALJ found Kirchner not disabled.  (Tr. 13-26).  On September 14, 2012, the Appeals Council denied review.  (Tr. 1-4).  Kirchner filed for judicial review of the final decision on November 15, 2012.  [1].

B.    **Background**

1.    *Disability Reports*

In a November 13, 2009 disability report, it was documented that Kirchner's date last insured was December 31, 2005.  (Tr. 132).  In an undated adult disability report, she reported that the conditions preventing her from working are spinal stenosis from a back injury, arthritis and a bulging disk in her back.  (Tr. 136).  Kirchner reported being 5 feet 8 inches tall and 230 pounds.  (Tr. 135).  She reported that her conditions prevent her from "walking, sitting, standing, and bending long periods of time."  (Tr. 136).  Her conditions cause "constant pain," "spinal stiffness . . . tenderness and pain" as well as "spasms" and "shooting pain" from her buttocks to her foot.  (*Id.*).  She reported attempting to work after her alleged onset date, but having to take more and more time off, as well as reducing her hours from 35 to 15 a week.  (*Id.*). She ultimately had to stop working on October 8, 2008.  (*Id.*).

Kirchner reported seeing a number of doctors for her condition as well as taking thirteen

different medications for pain, inflammation and spasms.  (Tr. 139-43).  She reported no side effects from these medications except a short period of headaches from Norflex, and that Vicodin "made [her] tired."  (Tr. 143).

In a December 17, 2009 function report, Kirchner reported that her day consists of getting her kids ready for school (although her husband and a neighbor transport them back and forth to school), checking email, playing on the computer, taking medication, watching television and falling asleep from her medications.  (Tr. 159).  She will then attempt to complete some chores such as laundry and putting away dishes, "with breaks."  (*Id.*).  When her children get home they perform the bulk of the work preparing and cleaning up after dinner.  (*Id.*).  Kirchner will then help her youngest child with homework, and do some things with her husband that she could not get done during the day alone, before retiring to bed.  (*Id.*).

Kirchner reported that she used to be able to engage in activities such as swimming, running, biking, roller skating and bowling, but can no longer do these things due to her conditions.  (Tr. 160).  She also reported that her conditions interfere with her sleep and her ability to care for her personal needs, including shaving, dressing and standing up from using the toilet.  (*Id.*).  She can prepare simple meals that take only a few minutes, sit to fold laundry, and stand for short periods of time to put away a few dishes.  (Tr. 161).  She reported being able to go out alone but that she often takes someone with her in case her back "goes out" and she cannot walk.  (Tr. 162).  She reported using an electric shopping cart at the store or having her oldest daughter go to the store for her.  (*Id.*).

Kirchner's hobbies include reading, using the computer, watching television and scrapbooking.  (Tr. 163).  She performs her hobbies "well" although she reported having trouble getting up after sitting too long.  (*Id.*).  She reported that her conditions interfere with her ability

3

to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and complete tasks.  (Tr. 164).  She reported only being able to lift a gallon of milk, walk ten minutes before needing to rest and sit five to ten minutes before needing to stand up.  (*Id.*).  She reported using crutches occasionally "when [her] hips [and] legs hurt [and she] can't hardly move," which occurs approximately "[once] a year," although they were not prescribed by a doctor.  (Tr. 165).

In an undated disability appeals report, Kirchner did not reveal any new conditions, but documented that her previously disclosed conditions were "progressively getting worse."  (Tr. 167).  She reported taking only five medications at this point:  Neurontin, Tramadol, Ultram, Vicodin and Zoloft (for depression, although she did not list depression as a new condition and specifically denied in her appeals report being treated by anyone for a mental impairment).  (Tr. 168-69).

### 2.    *Plaintiff's Testimony*

Kirchner testified at the hearing that she suffers from spinal stenosis that originated from a ruptured or bulging disc in her back sometime shortly before 2000.  (Tr. 31).  She testified that her condition causes chronic pain and interferes with her ability to walk.  (*Id.*).  She is "usually laying down or not doing a whole lot of much."  (*Id.*).  She testified that she has had three rounds of physical therapy, pain management and spinal injections, as well as being prescribed "tons of medication."  (Tr. 31-32).

Kirchner testified that her children, ages 21, 16 and 10, do most of the housework.  (Tr. 32).  She will occasionally go to the store, but rides on an electric cart.  (*Id.*).  Her day consists mostly of lying down and watching television.  (*Id.*).  Kirchner testified that although her condition had gotten worse over the years, she had similar physical restrictions as of her date last insured, December 31, 2005.  (Tr. 33-34).

4

3.     *Medical Evidence*

The relevant time period is from Kirchner's alleged onset date, April 15, 2000, through her date last insured, December 31, 2005.[1]  42 U.S.C. §§ 416(i)(2)(c); 423(a), (c), (d).  Here, much of the medical evidence post-dates Kirchner's date last insured.  Hence, this evidence is relevant, and will be discussed, only to the extent it sheds light on her condition prior to her date last insured.  *See King*, 896 F.2d at 205-06 (district court correctly found that medical evidence of disability after date last insured did not qualify claimant as disabled prior to that date).

a.     *Treating Sources*

i.     *Prior to Date Last Insured*

On April 10, 2000, Kirchner presented to the emergency room with neck pain originating from a motor vehicle accident.  (Tr. 245-46).  She presented with a "slight headache and left posterior neck pain in the soft tissue region."  (Tr. 245).  An examination revealed no obvious contusion in the neck region, and a cervical x-ray was negative for obvious fracture.  (Tr. 216; 245-46).  Kirchner was diagnosed with an acute contusion with strain in her left neck and mild

---

[1] To be eligible for disability insurance benefits, a person must become disabled during the period in which he or she has met the statutory special earnings requirements.  42 U.S.C. §§ 416(i)(2)(c); 423(a), (c), (d); 20 C.F.R. § 404.130. "If a clamant is no longer insured for disability insurance benefits at the time she files her application, she is entitled to disability insurance benefits only if she was disabled before the date she was last insured." *Renfro v. Barnhart*, 30 Fed. Appx. 431, 435 (6th Cir. 2002).  Therefore, the ALJ generally only considers evidence from the alleged disability onset date through the date last insured.  *King v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205–06 (6th Cir.1990). "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed Appx. 841, 845 (6th Cir. 2004).  Evidence of the plaintiff's condition after the date last insured is relevant to the disability decision only if the evidence "relate[s] back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 Fed Appx. 478, 480 (6th Cir. 2003).  If the plaintiff becomes disabled after the loss of insured status, the claim must be denied even though she became disabled thereafter.  *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Griffith v. Comm'r of Soc. Sec.*, No. 12-10575, 2013 U.S. Dist. LEXIS 114920, *18-19 (E.D. Mich. July 17, 2013) *adopted by* 2013 U.S. Dist. LEXIS 113858 (E.D. Mich. Aug. 13, 2013). .

cephalgia.  (Tr. 246).  She was prescribed Norflex and Motrin for pain.  (*Id.*).

On April 13, 2002, Kirchner returned to the emergency room complaining of back pain.  (Tr. 240-41).  She reported having been treated "on and off for the past three years" and that she had "[h]ad an EMG in 2001, which she states showed a pinched nerve, but they did not recommend any treatment."  (Tr. 240).  Upon examination Kirchner had a good range of motion, equal reflexes bilaterally, and equal toe and ankle strength.  (*Id.*).  A straight leg raising test was negative.  (*Id.*).  She was diagnosed with chronic lumbosacral pain and prescribed Motrin and Flexeril.  (*Id.*).

On June 21, 2002, Kirchner again presented to the emergency room with a complaint of neck pain after being involved in a second motor vehicle accident.  (Tr. 314-18).  Her back was normal upon examination, and cervical spine x-rays were negative.  (Tr. 315; 319).  She was discharged with Darvocet and Motrin.  (Tr. 315).

An MRI of Kirchner's lumbar spine taken on June 24, 2002, found a "[s]mall herniation L4-5 disk.  Mild degenerative facet changes L4-5.  Small left-sided bulge L5-S1 disk barely touching but not compressing the left S1 nerve root."  (Tr. 200; 214-15; 239).  An MRI of her cervical spine taken on July 15, 2002, was normal.  (Tr. 213; 238).

Kirchner underwent a neurosurgical consultation with Dr. Richard Lingenfelter on August 27, 2002.  (Tr. 196-99; 205-206; 234-37).  She reported back pain for the last four and a half years, with radiating leg pain for the last two years.  (Tr. 234).  She reported that the pain had gotten better since a motor vehicle accident two weeks prior.  (*Id.*).  She reported sharp pain that radiated down both legs intermittently, but no muscle weakness.  (*Id.*).  She further reported that she had tried physical therapy in the past but that it had not helped.  (*Id.*).  She reported being unable to stand more than 10 minutes at a time, and that she has trouble arising from

sitting when sitting for a long period of time.  (*Id.*).  Her pain was a 2-3 on a scale of 1-5, with her worst pain at a 5.  (Tr. 235; 205).  Dr. Lingenfelter noted that an EMG had been conducted on May 22, 2002, which showed "bilateral S1 and right L5 radiculopathy, mild, and compared to one year previous the study was somewhat better."  (*Id.*).

Upon examination, Kirchner had spinous process tenderness at L4-5 and L5-S1, but no facet tenderness.  (Tr. 236).  Range of motion of her waist "causes pain when she extends at the waist, as well as when she twists to the left."  (*Id.*).  A straight leg raising test was negative, there was no muscle wasting, edema or cyanosis, and her reflexes were 2+ in all extremities.  (*Id.*).  There was no sensory loss and she was able to toe and heal walk "without difficulty."  (*Id.*).  She did have a positive Patrick's sign on the left.  (*Id.*).  Kirchner was diagnosed with "[c]hronic lower back pain and bilateral lower extremity pain secondary to facet syndrome L4-5, right greater than left."  (*Id.*).  After discussion of treatment options, she decided to have a series of lumbar facet blocks and epidural steroid injections.  (Tr. 237).  She was to continue her current medications, which included Motrin and Skelaxin.  (Tr. 235-37).

Kirchner began a course of spinal injections with Dr. Michael Papenfuse on September 11, 2002.  (Tr. 189-90; 232-33).  On that date she received an epidural steroid block.  (Tr. 190; 232).  She received another epidural injection on September 26, 2002, with good results.  (Tr. 187-88; 230-31).  Notes from an appointment with Dr. Papenfuse on October 16, 2002, showed a "45 to 50% improvement overall" although he noted that Kirchner "continues with primarily lower back pain, really only on the left side at this point."  (Tr. 227-29).  Dr. Papenfuse suggested a course of facet blocks as well "for diagnostic as well as possibly therapeutic purpose," and Kirchner agreed.  (*Id.*).  Dr. Papenfuse administered the first block that day.  (*Id.*).

Kirchner next returned to Dr. Papenfuse more than two months later, on December 12,

2002. (Tr. 194-95; 225-26). She reported that after two epidural injections and one facet injection "her improvement was approximately 80%." (Tr. 194). However, over the intervening two months those gains had subsided and she was experiencing increased pain radiating into her bilateral buttocks. (*Id.*). She reported no relief from her medications, although she had not been taking them the previous four days. (*Id.*). Upon examination, Kirchner was found to be tender over the left facets at L5-S1 and over the left SI joint. (*Id.*). Reflexes, sensation and strength were normal and a straight leg raising test was negative. (*Id.*). Dr. Papenfuse administered a second facet block, gave Kirchner samples of Celebrex, and prescribed Darvocet. (Tr. 195).

At a January 28, 2003 follow-up appointment with Dr. Papenfuse, Kirchner reported a 35% improvement since her last appointment, although she still complained of pain radiating to her right buttocks. (Tr. 191-93). She reported the pain was worse after standing 15 minutes and was better after sitting, but would worsen if she sat more than 20 minutes. (Tr. 191). She did not have any muscle spasms, nor did the pain wake her up at night. (*Id.*). An examination revealed slight tenderness at L5-S1 midline and left facets L4-S1, but no tenderness elsewhere. (Tr. 192). Lower extremity strength was full, reflexes were equal and a straight leg raising test was negative. (*Id.*). Dr. Papenfuse scheduled her for a second facet block and gave her more samples of Celebrex. (Tr. 192-93). Kirchner underwent this second facet block on February 12, 2003, with good results. (Tr. 183-84).

Kirchner returned for another facet block injection on April 1, 2003, after being unable to follow-up earlier due to personal issues. (Tr. 180-81). At that appointment she reported increased discomfort and an examination revealed paraspinal tenderness at L2-L5 but no tenderness at L5-S1 or at the SI joint. (Tr. 181). Dr. Papenfuse administered the block and prescribed physical therapy. (Tr. 181-82). In addition, he gave Kirchner samples of Vioxx and a

prescription for Ultracet for paint.  (Tr. 182).  He recommended a follow-up in two weeks. However, there are no further records from Dr. Papenfuse, and a series of letters to Kirchner from his office dated between April 16 and June 4, 2003, reveal that she missed her subsequent appointments and was terminated from the practice.  (Tr. 202-204).  There are no physical therapy treatment notes in the record.

On October 13, 2004, Kirchner presented to the emergency room with complaints of gradual onset neck pain.  (Tr. 297-301).  She also reported a one week history of numbness in her fourth and fifth finger.  (Tr. 297).  Examination revealed pain with flexion of the neck and rotation to the right, but no cervical tenderness and a normal range of motion.  (Tr. 298). Kirchner was discharged with "acute neck pain possible musculoskeletal in etiology" and "acute left hand numbness, possible ulnar nerve entrapment."  (*Id.*).  She was prescribed Motrin and Valium.  (*Id.*).

*ii.    Subsequent to Date Last Insured*

It appears from the record that Kirchner's condition went untreated for approximately two years, until March 2006 when she began treating with Dr. Chdiozie Ononuju.  (Tr. 268-69). Dr. Ononuju's notes are generally illegible, but it does appear that on that date Kirchner complained of back pain.  (Tr. 268).  Utilizing a checklist, Dr. Ononuju indicated "neuropathy," "tenderness" and "decrease" in Kirchner's "extremities."  (Tr. 269).  He also checked boxes for structural irregularities including somatic dysfunction, tenderness and problems in the cervical and thoracic/sacral areas.  (*Id.*).  His diagnosis is illegible, but it appears he ordered a "scan." (*Id.*).  Kirchner underwent a bone density scan on March 6, 2006, the results of which were normal.  (Tr. 279-82).

She returned to Dr. Ononuju on June 2, 2006, to obtain "lab results" and complained of

9

back, leg and buttocks pain.  (Tr. 266-67).  Dr. Ononuju's checklist exam indicated "decrease" in Kirchner's extremities, as well as "tenderness."  (Tr. 267).  She also exhibited radiculopathy and structure abnormalities in her cervical and thoracic/sacral areas.  (*Id.*).  The remainder of the notes from this appointment are illegible.  (*Id.*).  Kirchner returned on June 23, 2006, again complaining of back pain, as well as the flu.  (Tr. 264-65).  No examination appears to have been done in relation to her back pain at this appointment.  (Tr. 265).  However, an MRI conducted on June 30, 2006, revealed "mild segmental spinal stenosis, bilateral lateral recess, bilateral inferior neural foraminal narrowing at L4-5 level from circumferential disc bulge, bilateral facet degenerative changes, and ligamentum flavum thickening."  (Tr. 270-71).  It also revealed "[b]road based left paracentral, foraminal disc protrusion in conjunction with facet degenerative changes and ligamentum flavum thickening causing left lateral recess and left neural foraminal narrowing."  (*Id.*).  Annular tears were seen at L4-5 and L5-S1, as well as "[l]ow signal intensity in the lumbar vertebral bodies which is probably related to anemia."  (*Id.*).

On August 10, 2006, Kirchner was evaluated by Dr. Malcolm Field, a neurosurgeon.  (Tr. 262; 278).  Dr. Field noted the MRI results but also found that despite these results Kirchner did not have "a great deal of spinal stenosis."  (*Id.*).  An examination did not reveal any "atrophy, fasciculations, autonomic change or reflex loss."  (*Id.*).  Dr. Field found that Kirchner's "range of lumbar spine motion is limited at about 80%" but that her abduction was normal and the "rest of the evaluation is within normal limits."  (*Id.*).  He concluded that Kirchner was "neurologically intact" and suggested a course of epidural blocks, physical therapy and muscle relaxants.  (*Id.*). He did not believe her condition warranted "operative intervention."  (*Id.*).

After this, there is again a large gap in Kirchner's records – three and a half years.  She was next seen for her condition on November 18, 2009, by Dr. Kevin Robinson, an orthopedic

surgeon to whom she complained of severe back pain.  (Tr. 332).   However, it appears Dr. Robinson's records are incomplete as the treatment record from this date only includes one page, which appears to cut off part of the standard check list of physical examination categories (i.e., there is no set of categories for neurological or musculoskeletal systems on the produced page), nor is there a space for making a diagnosis or recommending a treatment.  (Tr. 330-32).   The same is true for treatment notes from the next two appointments, on December 21, 2009, and February 17, 2010, where Kirchner continued to complain of back pain.  (Tr. 330-31).

However, a nurse practitioner in Robinson's office did record treatment for Kirchner on February 16, 2010.  (Tr. 343-45).   An examination revealed that Kirchner was "able to heel and to[e] walk easily," and "able to forward flex to approximately 12 inches from the floor."  (Tr. 343).   She had decreased lateral flexion and was unable to extend due to pain.  (*Id.*).   However, her muscle strength was good, her reflexes were symmetrical and a straight leg raising test was negative.  (*Id.*).   There was also no tenderness midline and no SI joint tenderness bilaterally. (*Id.*).   Dr. Robinson diagnosed spinal stenosis, low back pain with radiculopathy, and degenerative disc disease with facet arthritis.  (*Id.*).   He prescribed Amrix, Naproxen and Ultram, along with a Flector patch. (*Id.*).   He also recommended aqua therapy.  (*Id.*).

Kirchner returned to Dr. Robinson on March 2, 2010, on crutches, complaining of increased pain radiating to both legs.  (Tr. 346).   An examination revealed symmetrical reflexes, a negative straight leg raising test and good strength.  (*Id.*).   There was noted tenderness over the left SI joint and left hip pain with flexion and rotation.   (*Id.*).   Dr. Robinson assessed osteoarthritis of the left hip and administered an injection into that area.  (*Id.*).   He also ordered x-rays of the lumbar spine and hips.  (*Id.*).   X-rays taken on March 4, 2010, of Kirchner's lumbar spine revealed "disk space narrowing at L5-S1 with no instability and no other abnormalities [ ]

seen.  There is no spondylolyis or spondylolisthesis."  (Tr. 347).  X-rays taken of her hips the same day found "[n]ormal pelvis and hips."  (Tr. 348).

At a follow-up appointment on March 30, 2010, Kirchner reported marked improvement after the injection, so much so that she was riding a stationary bike up to 5 miles a day and had lost weight as a result.  (Tr. 349).  She presented with a normal gait and no ambulatory aid.  (*Id.*).  Her strength and reflexes were good and she had no tenderness.  (*Id.*).  A straight leg raising test was negative and there was no hip pain with range of motion.  (*Id.*).  Despite the radiologist's report of normal hips, Dr. Robinson found "mild degenerative in the acetabular margin."  (*Id.*).  Kirchner's medications were managed and she was given exercises for strengthening.  (*Id.*).  Progress notes from appointments on June 17 and 22, 2010, showed that Kirchner had requested prescriptions of Zoloft and Vicodin from Dr. Robinson, and that she was "walking, exercising at home."  (Tr. 352).  She reported improvement with the Flector patch and Skelaxin, as well as the injection.  (*Id.*).  An examination revealed a negative straight leg raising test, symmetrical reflexes and no tenderness.  (*Id.*).  She was able to toe and heel walk.  (*Id.*).  Her medications were managed.  (*Id.*).

An MRI taken on July 23, 2010 of Kirchner's lumbar spine revealed a "[t]iny central protrusion with annular tear at L4-L5 without significant spinal canal narrowing."  (Tr. 354).  Kirchner returned to Dr. Robinson on August 19, 2010, claiming she was ready for surgery.  (Tr. 351).  She reported that her pain had not worsened, but had also not gotten better.  (*Id.*).  An examination found that Kirchner was able to heel and toe walk, had symmetrical reflexes, intact sensation and mild tenderness along her midline.  (*Id.*).  A straight leg raising test was negative.  (*Id.*).  Kirchner was seen by Dr. Laksmana Madala on October 11, 2010, who found that she presented with an antalgic gait and cervical paraspinal tenderness, as well as mild pain on lumbar

flexion and moderate pain with extension. (Tr. 350). She concluded that Kirchner would benefit "from lumbar epidural and bilateral L5 S1 facet joint injections." (*Id.*). She also started Kirchner on Celebrex. (*Id.*).

Kirchner returned to Dr. Robinson on February 15, 2011. (Tr. 353). She reported having received three injections in December with only 2-3 days relief with each. (*Id.*). She reported falling when her back "gave out." (*Id.*). An examination revealed her ability to heel and toe walk, no spinal midline or SI joint tenderness, symmetrical reflexes and good strength. (*Id.*). However, there was pain with lateral flexion to the right and left. (*Id.*). Surgery was discussed and a follow-up was scheduled pre-operatively. (*Id.*).

On April 6, 2011, Dr. Robinson was deposed by Kirchner's counsel in this case. (Tr. 356-86). After reciting Kirchner's treatment notes to date, Robinson testified that, based a comparison of her 2002 MRI with her 2010 MRI, he found her condition to be consistent in severity, if not better in 2010 than in 2002. (Tr. 372-75; 377). He testified that the fact that the 2002 MRI showed only that the herniated bulge in Kirchner's disc was touching, but not compressing, the nerve root was not indicative of her pain level, as the pressure on that nerve root could change based on position. (Tr. 373). Although he saw more thickening of the ligaments on her 2010 MRI, which was now constricting the central cord area, as well as some new narrowing of the foramen, and despite the fact that her current complaints involved radiculopathy to the left, rather than the right lower extremities, he maintained that the MRI findings were sufficiently similar to one another that he could render an opinion on her ability to work prior to her date last insured. (Tr. 374; 377-78). Furthermore, he concluded that Kirchner's negative straight leg raising tests were not indicative of her level of pain or the severity of her condition. (Tr. 375-76). Although another EMG study had never been

13

conducted, Dr. Robinson opined that Kirchner's 2002 EMG findings were still consistent with her present complaints, probably with some improvement now "based on the fact that she's probably not doing as much as she was doing prior to 2000." (Tr. 377-78).  Based on his review of her medical records, Robinson testified that, "with a high degree of medical certainty," Kirchner could not have worked a full work day or work week prior to December 2005, despite the fact that he himself did not begin treating her until 2009.  (*Id.*).  He opined that she would have trouble with a job that "required her to sit for long periods, stand, bend, stoop, kneel, [and] stair climb[]."  (Tr. 378).  He noted that she would "have to change positions frequently" and that her use of narcotic medications would make it difficult for her to work "that length of time without severe pain."  (*Id.*).  He also opined that, based on a review of her previous MRI and EMG studies, Kirchner would have needed to lie down frequently prior to 2005.  (Tr. 380).  He concluded that Kirchner had exhausted conservative treatment and would likely need surgical correction to alleviate her symptoms, which would require at least six months of healing time. (Tr. 380-82).

### 4.    *Vocational Expert's Testimony*

VE Pauline McEachin testified that Kirchner's past relevant work as a cook was classified as medium in exertion and skilled, generating transferrable skills specific to the trade. (Tr. 36).  The ALJ then asked the VE to imagine a hypothetical claimant of Kirchner's age, education and vocational background who is "able to perform light work as defined by the regulations except that she can only occasionally climb, balance, stoop, crouch, kneel, or crawl. (Tr. 36).  The ALJ asked if there were any jobs in the economy that such a person could perform. (*Id.*).  The VE testified that such a person could perform unskilled jobs such as information clerk (1,700 positions in the regional economy), security guard (6,000 positions) or food service

14

worker (15,000 positions).  (*Id.*).  The ALJ then modified the hypothetical to assume that the individual could not engage in sustained work activity on a regular and continuing basis for eight hours a day five days a week.  (*Id.*).  The VE testified that such a limitation would preclude competitive employment.  (*Id.*).

Counsel for Kirchner asked the VE about the allowable absences of the above-named positions, and the VE testified that they would allow for no more than one a month, on average. (Tr. 37).  When asked about the number and duration of breaks, the VE testified that the positions would allow for two 15-minute breaks and one 30-60 minute lunch.  (*Id.*).  Therefore, she testified, if a person needed to lie down at unpredictable times throughout the day it would preclude competitive employment.  (Tr. 37-38).  The VE testified that her testimony comported with the Dictionary of Occupational Titles.  (Tr. 37).

### C.      Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Applying the five-step sequential analysis, the ALJ concluded that Kirchner was not disabled as of her date last insured, December 31, 2005.  At Step One he determined that Kirchner had not engaged in substantial gainful activity from her alleged onset date to the date last insured.  (Tr. 18).  At Step Two he found the following severe impairment:  "degenerative disc disease."  (*Id.*).  At Step Three he concluded that Kirchner's severe impairment did not meet or medically equal a listed impairment.  (Tr. 20).  The ALJ then assessed Kirchner's residual functional capacity ("RFC"), finding her capable of performing "light work . . . with only occasional climbing, balancing, crouching, stooping, kneeling, and crawling."  (*Id.*).  At Step Four he found that, based on her RFC, Kirchner was unable to perform past relevant work.  (Tr. 21).  At Step Five he concluded, based on Kirchner's age, education, vocational experience and

RFC, and based on VE testimony, there were a significant number of jobs Kirchner could still

perform.  (Tr. 21-22).  Therefore, she was not disabled.  (Tr. 22).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

Court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not

remand for further administrative proceedings unless the claimant has been prejudiced on the

merits or deprived of substantial rights because of the agency's procedural lapses.") (internal

quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's

decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide

questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486

F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility

of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court

is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Kirchner's sole argument on appeal is that the ALJ erred in formulating his hypothetical question to the VE, and in so erring, relied on VE testimony that included jobs that Kirchner could not perform, given her limitations. She couches this argument in terms of the Commissioner's failure to meet her burden at Step Five. However, this is not a scenario where the ALJ's hypothetical failed to match up to the RFC he ultimately imposed. To the contrary, the ALJ's hypothetical in this case was identical to his RFC assessment.

Kirchner's Step Five argument is a veiled attack on the ALJ's underlying RFC finding. At the first four steps of the analysis, which includes formulation of the RFC, the burden is on the claimant to prove disability. The Court finds that Kirchner failed to meet this burden and that the ALJ's RFC analysis, and his ultimate conclusion, are supported by substantial evidence.

Kirchner's argument rests almost entirely on her subjective hearing testimony (*see* Plf.

Brf. at 9-11).  However, the ALJ specifically found Kirchner's subjective complaints to be less than fully credible, (Tr. 20-21), and Kirchner makes no direct argument attacking the ALJ's credibility finding, therefore that finding stands.  *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted).  At any rate, the ALJ's finding is supported by substantial evidence.  He specifically noted that despite Kirchner's subjective testimony and complaints, objective medical records did not corroborate her allegations of intense pain, in that she had, even recently, rated her pain as only a 4/10, had a normal gait, and was able to heel and toe walk without difficulty.  (Tr. 21).  The ALJ noted that shortly after her date last insured, Kirchner had been found by Dr. Field to be neurologically intact.  (*Id.*).  Finally, the ALJ noted that Kirchner had no apparent difficulty entering or exiting the hearing room, or getting in or out of the witness chair.  (*Id.*).  Although not specifically characterized as such, the Court interprets the ALJ's inclusion of this piece of evidence as contradicting Kirchner's most consistent allegation that her pain made sitting and arising from sitting difficult, (Tr. 163; 191; 234), further undermining her credibility.

Furthermore, although Kirchner does not mention the deposition testimony of Dr. Robinson in her brief, the Court notes that the ALJ properly assessed, and rejected, his opinion that, as of her date last insured, she was unable to work a full day (*supra* at 13-14; Tr. 377-78), finding it was entitled to little or no weight for a few reasons.  First, the ALJ noted that Dr. Robinson only began treating Kirchner 5 years after her date last insured, making his opinion (which likewise was issued 5 years after that date) of little value.  (Tr. 21).  *See Siterlet v. Sec'y*

*of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (finding that physician opinions issued after the claimant's insured status expires are not relevant to her pre-insured status condition.); *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) ("…this court has held that a treating physician's opinion is 'minimally probative' when the physician began treatment after the expiration of the claimant's insured status." (quoting *Siterlet*, 823 F.2d at 920). *See also Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (ALJ properly rejected treating physician's opinion where physician did not see claimant until two years after physician said claimant became disabled.). Second, the ALJ properly found that Dr. Robinson's opinion did not conform to the objective evidence. (Tr. 21); *Jones v. Comm'r of Social Security*, 121 F.3d 708, at *1 (6th Cir. 1997) (a claimant who fails to prove she was suffering from a disability *while insured* does not become entitled to disability insurance benefits if she becomes disabled *after* her insured status expires) (citing 42 U.S.C. § 416(i)(2)(C)). *See also Hamilton v. Apfel*, 178 F.3d 1294 (6th Cir. 1999) (citing *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)); 42 U.S.C. § 423(a), (c) and (d). Again, the ALJ noted, *inter alia*, that Kirchner had been, shortly after her date last insured, deemed neurologically intact by Dr. Field, (Tr. 21), that she had recently rated her pain at only a 4/10 in severity, had a normal gait, and could heel and toe walk easily. (*Id.*). Finally, the ALJ noted that "Just after the date last insured [s]he had no atrophy and her lumbar spine range of motion was only slightly limited at 80%." (*Id.*).

While Kirchner argues that her MRI results from 2000 and 2002 show that her low back pain arose prior to the date last insured, this is not the relevant inquiry. It is not sufficient that Kirchner was diagnosed with back pain prior to her date last insured. Rather, the salient question is whether she suffered from such severe functional limitations as a result of that diagnosis that she was prevented from working at or prior to that time. *See supra*, fn. 1. *See also Dukes v.*

*Comm'r of Soc. Sec.*, No. 10-436, 2011 U.S. Dist. LEXIS 105526 at *16, 2011 WL 4374557 (W.D. Mich. Sept. 19. 2011) *quoting McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 U.S. App. LEXIS 11791, 2000 WL 687680 at *5 (6th Cir. May 19, 2000) ("[T]he mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual."); 42 U.S.C. §§ 423(d)(1)(A) (disease must interfere with claimant's ability to work so severely that claimant is unable to perform any substantial gainful activity). The ALJ properly concluded Kirchner did not have such functional limitations as of her date last insured. For all of these reason reasons, the Court finds the ALJ's conclusion regarding Dr. Robinson's opinion is supported by substantial evidence.[2]

Because the ALJ's RFC assessment is supported by substantial evidence in the record, and because his hypothetical question to the VE fairly encompassed the credible limitations imposed by his RFC, the Court finds he was entitled to rely on the VE's testimony that Kirchner was capable of performing a significant number of jobs in the national economy, including positions as an information clerk, security guard, and food service worker, during the relevant period. (Tr. 22). Therefore, his ultimate conclusion, that Kirchner was not disabled prior to her date last insured, is supported by substantial evidence and should be upheld.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Kirchner's Motion for Summary Judgment **[9]** be **DENIED**, the Commissioner's Motion **[13]** be **GRANTED,** and this case be **AFFIRMED**.

Dated: September 30, 2013          s/David R. Grand
Ann Arbor, Michigan               DAVID R. GRAND
                                  United States Magistrate Judge

---

[2] Again, Kirchner does not so much as mention Dr. Robinson in her papers, so it is unclear on what basis (and indeed, whether) she challenges the ALJ's determinations with respect to his opinion.

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager
